STANDARD BRANDS INCORPO-
RATED, Plaintiff,

v.

U. S. PARTITION & PACKAGING CORP.,
Milton Chernin, Donald F. Cunningham,
Donald Engle and Earl F. Millard, De-
fendants.

STANDARD BRANDS INCORPO-
RATED, Plaintiff,

v.

Earl F. MILLARD, Defendant.

Nos. 57-C-235, 58-C-82.

United States District Court
E. D. Wisconsin.

July 27, 1961.

As Amended by Order Filed
Oct. 16, 1961.

On Post-trial Motion Nov. 29, 1961.

John C. Butler and David R. Mac-Donald, Chicago, Ill., Lester S. Clemons, Adrian L. Bateman, Jr., and Quarles, Herriott & Clemons, Milwaukee, Wis., for plaintiff.

Marvin E. Klitsner, Lyman A. Precourt, Foley, Sammond & Lardner, Elwin A. Andrus and Andrus & Starke, Milwaukee, Wis., for defendants.

GRUBB, District Judge.

The above-entitled actions have been consolidated for purpose of trial to the court on plaintiff's causes of action for unfair competition and demand for equitable relief. Plaintiff's claim for patent infringement and the respective counterclaims of the parties in action 57–C–235, as well as the question of money damages, have been severed under Rule 42(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Jurisdiction is grounded on diversity of citizenship.

Plaintiff, Standard Brands Incorporated, hereinafter called "Standard Brands," is a Delaware corporation with its principal office in New York City, New York. It is licensed to transact business in the State of Wisconsin and is engaged principally in the business of food processing and packaging.

American Partition Company is an unincorporated division of Standard Brands. It is engaged in the business of manufacturing and selling chipboard partitions and other paper product partitions for cases, boxes, and containers. Its immediate predecessor was the American Partition Corporation, a Wisconsin corporation organized on December 19, 1946. Each is hereinafter sometimes called "American." On or about January 1, 1947, American began the manufacture and sale of partitions, succeeding to such business which had theretofore been operated by a partnership known as the Cream City Brewery Supply Co., whose partners had caused American's formation and had become its stockholders.

The business of American has been conducted at 3043 North 30th Street, Milwaukee, Wisconsin, originally under a sublease to it of such property from Cream City Brewery Supply Co. and later as assignee of the leasehold therein from such partnership, the lease being for a term of ten years, expiring on March 31, 1956.

In the early part of 1948, the outstanding stock of American was purchased by Clinton Industries, Inc., a Delaware corporation, which by subsequent change of name became Clinton Foods, Inc., and is hereinafter referred to as "Clinton." On October 9, 1952, American was merged into Clinton, and its business was thereafter conducted as the American Partition Company, an unincorporated division of Clinton. On November 22, 1955, two of Standard Brand's executive officers entered into a memorandum understanding with the chairman of the board of Clinton to purchase the property and business (as a going concern) of Clinton's Corn Products and American Partition Divisions, pursuant to which Clinton agreed to conduct the business of these two divisions after October 31, 1955, for the account of Standard Brands until the closing date of the sale. The memorandum understanding was formalized by a written contract dated December 8, 1955, between Clinton and Standard Brands. This contract was performed, and the sale of the two divisions to Standard Brands was closed on April 16, 1956. Thereafter, and continuously to the present, American conducted its business as a division of Standard Brands.

Defendants Milton Chernin, Donald F. Cunningham, and Donald Engle are citizens and residents of Wisconsin. Defendant Earl F. Millard is a citizen and resident of Illinois.

Millard began to work for Clinton in June of 1948. He was elected executive vice president in March of 1949 and president on April 4, 1949, of American, which at that time was Clinton's wholly-owned subsidiary. After American was merged into Clinton, Millard continued to use the title "president" while he was general manager of American until his resignation, effective January 7, 1957.

In 1956, Millard was paid a salary of $25,000 and an annual bonus of $6,000.

Cunningham was employed originally by Cream City Brewery Supply Co., American's predecessor, in 1944 as plant manager in charge of the manufacture of partitions. He continued in this capacity under American until October 6, 1947, when he terminated this employment.

Chernin was a partner in Cream City Brewery Supply Co. in charge of sales. Upon the organization of American, Chernin became its president and continued in the same sales function until October 4, 1947, when he resigned.

On May 16, 1949, Cunningham and Chernin were rehired by American.

From May 16, 1949 to January 7, 1957, when his resignation was accepted by Standard Brands, Cunningham was primarily responsible for American's production and machinery. During this period it was among his duties to supervise production and engineering at American's plants; to supervise all of American's production personnel; to supervise the repair and improvement of American's machinery and the development of new techniques and new machines; and to supervise the operation of American's plant and warehouse facilities.

In 1954 Cunningham was named as American's vice president in charge of production. As production head, he was in direct charge of American's several plant managers and plant superintendents. In this year his annual salary was established at $20,000, at which rate it was thereafter continued. Additionally, in every year following 1949, he was paid an annual bonus of $5,000 except in the year 1951 when he was paid a bonus of $10,000.

On his re-employment by American in 1949, Chernin was primarily responsible for the sale and promotion of American's partitions. He supervised or participated in the making of cost estimations, price quotations, and sales servicing.

In 1954 Chernin was named as American's vice president in charge of sales and advertising. He was in direct charge of all of American's sales and costing personnel except the manager, now deceased, of American's Bound Brook plant who had coordinate sales authority in respect to that plant. The remuneration for his services was identical to that of Cunningham.

Engle was initially employed by American in 1951 as a draftsman. In 1952 Engle was made the toolroom foreman of American's Milwaukee plant, which position he occupied until he left American's employment on November 15, 1956. As toolroom foreman, Engle was responsible for the repair of American's machines; for the maintenance of its dies and machine parts; for the preparation of its drawings; for the custody of such drawings and patterns; and for the scheduling of production. In the performance of these responsibilities, Engle supervised the work of American's draftsmen, its machinists, die repairmen, stock clerk, and mechanics.

In May 1956 Millard, Cunningham, and Chernin and Engle, who agreed to assist them, made plans to put themselves into a position to go into the partition manufacturing business should continued employment by Standard Brands become unavailable or undesirable. They chose to use U. S. Partition & Packaging Corp. as a vehicle for this purpose.

Defendant, U. S. Partition & Packaging Corp., was incorporated under the laws of Wisconsin on April 23, 1953, under the then name of U. S. Trading Corporation. Such company is hereinafter generically called "U. S. Partition." It has its principal place of business at 1640 West Silver Spring Drive, Glendale, Wisconsin, hereinafter referred to as the "Glendale property." At the time of its organization, its officers were Millard as president, Cunningham as vice president, and Chernin as secretary-treasurer. At all times these men have constituted its board of directors and, together with the wives of Chernin and Cunningham, have been its only stockholders. At the present time, Chernin is president, Cunningham is vice president, and Engle is

assistant vice president of U. S. Partition. U. S. Partition has been since January 7, 1957, and is now engaged in the business of manufacturing and selling chipboard and other paper product partitions for cases, boxes, and containers. Since on or about January 24, 1957, U. S. Partition's operations have been in direct competition with those of American.

In support of its allegations of conspiracy to engage in unfair competition, Standard Brands claims that Millard, Cunningham, and Chernin, aided by Engle, used their positions and the opportunities thereby available to them at American secretly to plan and carry into effect the business operations carried on in the name of the corporate defendant, U. S. Partition, in competition with those of Standard Brands. Specifically it is claimed that defendants, in realizing their objectives, wrongfully engaged in the following activities: (1) They diverted to themselves a business opportunity in the acquisition of the Glendale property; (2) they made improper use of American's drawings and patterns; (3) while employed at American, as well as after terminating their employment with plaintiff, they solicited and used American personnel to work for U. S. Partition; and (4) they usurped the good will of American's customers.

Allegedly, these acts are wrongful because they were undertaken in breach of the fiduciary duty these agents owed their principal, Standard Brands. Additionally, it is claimed that there was wrongful appropriation of trade secrets. The facts in respect to these activities, as stipulated by the parties and as established by the evidence on the trial of the case, follow.

1. *The Acquisition of the Glendale Property.*

Under date of November 2, 1955, the board of directors of U. S. Partition authorized its officers to negotiate for the purchase of the Glendale property a parcel of real estate of approximately two acres, the purchase price not to exceed $67,000. This parcel was improved with a one-story factory building of concrete block, having an approximate area of 16,500 square feet, suitable for use as a manufacturing plant or warehouse building for industrial or commercial purposes of various kinds including use for the manufacture of partitions. Pursuant to the directors' authorization, U. S. Partition purchased this parcel for the sum of $65,000, title being conveyed by deed dated January 18, 1956.

Around the middle of December 1955 and in April 1956, before as well as after U. S. Partition's purchase of this property, Engle, at the direction of Cunningham, instructed one of American's draftsmen, William Tito, to prepare certain layout, elevation, and other drawings of the factory building and site of the Glendale property. The prints and original drawings prepared accordingly were given to Cunningham, and American's title blocks were removed therefrom.

At the beginning of 1955, American's plant facilities in Milwaukee consisted of its North 30th Street plant, having an area of approximately 43,000 square feet. Additionally, American leased on a month-to-month basis two warehouses of about 20,000 square feet which it used for the storage of its raw materials. Cunningham had never thought that American's plant location in Milwaukee was a suitable one and had recommended to Millard that American's entire plant be moved to suitable larger quarters, or that all of American's hand assembly department, together with its equipment, be moved to another building to eliminate American's need for warehouse space.

In January 1955, Cunningham, with Millard's concurrence, made various inquiries concerning other possible facilities. During the middle of 1955, Millard viewed the Glendale property. Between December 15 and December 30, 1955, after Cunningham presented him with the layout drawings of the Glendale plant and proposed that part of American's operations be transferred to this plant, Millard decided against acquiring said premises for American. On December 30,

1955, Millard confirmed to the owner of the 3043 North 30th Street property the renewal of American's lease for a period of five years from March 31, 1956, at a monthly rental of $1,250 plus American's assumption of the real estate taxes on the premises.

Millard did not inform Clinton or Standard Brands of the availability of the Glendale property as a possible plant site for American's operations or that he rejected its purchase or lease for such purpose. Millard testified that he believed the Glendale property unsuitable for American because it was too small and that he opposed splitting American's operations. In rejecting the site, he also considered the investment in improvements of the leasehold then occupied by American and the cost of moving.

American renewed its lease in 1961 for an additional six year term on similar terms as before except that the prior provision requiring the lessor's consent to assignment or sublease by American was eliminated. Mark Candee, the president of American since January 1957, testified that American looked for but found no other location adequate for its purposes.

2. *Use of American's Drawings and Patterns.*

The drawings and patterns in issue relate to certain machinery used by American known as the "semi-automatic Dauber-Vails." The history of the development of these machines, insofar as it is pertinent to the unfair competition claims of this case, is as follows:

In 1944 American's predecessor, Cream City Brewery Supply Company, manufactured partitions by use of a machine whereby the longitudinal strips of the partition produced on a stripper were fed by hand in series of threes into an assembler where they were fashioned into a partition by being interlocked with the transverse strip formed on the assembler. These machines, known as Dauber-Vail strippers and assemblers, were capable of producing about 350 sets of partitions per hour. They were constructed on a nonexclusive basis by the Dauber Company and its successor, Fox River Manufacturing Company, hereinafter called "Fox River," the stock of which was principally owned by Simon E. Schroeder and Joseph H. Schroeder.

During his term of employment at American's predecessor from 1944 to 1947, Cunningham, who had had no previous experience with the Dauber-Vail assembler and stripper, designed, built, and placed an attachment on each of the assemblers which fed one of the three longitudinal partition strips into the assembler. He further built two experimental automatic machines which, in effect, were a combination of the Dauber-Vail assembler and stripper, together with other novel features devised by him and others in American's employ.

In April 1947, American entered into agreements with Fox River and with the Schroeders individually, providing, *inter alia*, for the exclusive manufacture and sale of a number of automatic partition assembly machines. Pursuant to said contract Fox River developed and delivered to American certain machines, hereinafter sometimes referred to as "Schroeder hopper-feeders." The machines consisted of (1) a hopper mechanism into which preformed partition strips were placed in several parallel stacks, which mechanism automatically and simultaneously released one such strip from each stack, and (2) a feeder mechanism which advanced such strips into the assembly zone of the Dauber-Vail assembler by the use of feed rollers. The Schroeder hopper-feeder mechanism thus performed the functions of storing, releasing mechanically, and feeding the longitudinal strips in parallel to the assembly of the Dauber-Vail assembler.

The Dauber-Vail assembler, operated in conjunction with the Schroeder hopper-feeder, was sometimes called and will be hereinafter referred to as the "semi-automatic Dauber-Vail." It is characterized as semi-automatic due to the fact that one step in its operation; i. e., the placement of the preformed longitudinal strips into the hopper, was not automatically performed but was done by hand.

With the adaptation of the Schroeder hopper-feeder mechanism, the production rate of the Dauber-Vail assembler increased so that in 1955 it was able to produce approximately 2,600 sets of partitions per hour. Cunningham considered the semi-automatic Dauber-Vail to be the best of all partition assembly machines with which he was familiar. American followed a policy of not selling these machines and took steps to prevent viewing thereof by its competitors.

At the time Cunningham was re-employed by American in May of 1949, it had some drawings of the various parts of its then existing partition machinery but no complete set. During the period 1949–1951, American hired several draftsmen who, under the direction and supervision of Cunningham and working directly from its machinery and using the measurements of the machine parts, prepared a complete set of drawings (i. e., tracings from which prints could be and were made) for each of its different types of machinery.

Such drawings, to the extent the machinery mechanism to which they pertained was patented, could in part have been obtained from the patent drawings, but the latter would not show all specifics on each machine nor would they show the part dimensions. As modifications were thereafter made in the parts, the drawings were revised. This job was performed by or under the supervision of Donald Engle.

As of 1955 to 1956, American had 147 drawings of its Dauber-Vail stripper, 466 drawings of the semi-automatic Dauber-Vail (173 of the assembler and 293 of the hopper-feeder), and 58 drawings of the roll rack equipment, for a total of 671 drawings.

While these drawings of American's partition machinery were being completed, Cunningham obtained a set of the prints pertaining to the Dauber-Vail stripper, the semi-automatic Dauber-Vail, and the roll rack equipment used in connection with the machinery. As changes were thereafter made in American's drawings, Engle would, on specific request from Cunningham, supply the latter with a print of such change.

American kept its tracings (the master copies from which prints were prepared) in its vault in its Milwaukee plant. A set of prints from these tracings was kept in a filing cabinet located in its Milwaukee plant toolroom. These drawings were not permitted to leave American's premises except for special purposes.

On or about the first of June 1956, Cunningham began to supply Engle with prints of American's Dauber-Vail machinery, eventually giving him the whole assortment. Cunningham used these in the construction of two units of Dauber-Vail equipment, each unit consisting of a Dauber-Vail stripper, a semi-automatic Dauber-Vail, and two roll racks, for U. S. Partition at Mumper Machine Company, hereinafter called "Mumper," located at Butler, Wisconsin.

At first Cunningham gave such prints to Engle in the sequence in which they were needed to carry on the work at Mumper, but later he gave him the whole assortment. Engle, in some instances, prepared and delivered to Mumper sketches which were made by reference to such prints as a guide and which sketches would show the pertinent dimensions of the part to be constructed. In other instances Engle gave the prints themselves to Mumper. In all cases, before delivery to Mumper or any other place outside of American's plant, in accordance with Cunningham's instructions, the title block portion of prints on which American's name appeared would be cut off to conceal their origin. In still other instances, U. S. Partition copied or traced American's drawings onto its own title block paper when it began to prepare prints of its partition machinery parts and components some time after March 1, 1957. These latter drawings were prepared under the supervision of Engle who used the same numbering system employed by American, part for part. Expert testimony on the trial demonstrated that, except for twelve drawings in this category,

168

these drawings were prepared by referring to, copying, and tracing from the counterpart American drawing in the possession of the defendants.

Preparation of these drawings by a competent draftsman under the supervision of a person capable of constructing a Dauber-Vail stripper and the semi-automatic Dauber-Vail without resort to prior drawings or patterns—and Cunningham and Engle, among a total of five persons, were capable of such construction—would entail one year of work, following which the tolerances shown for the various parts would have to be readjusted. Parts prepared according to such new drawings prior to their adjustments would in many cases have to be reworked in order to fit within the assembly.

U. S. Partition units Nos. 1 and 2 are substantially similar to American's machinery. The only major differences between these units and American's equipment were a vacuum as distinct from a mechanical release of partition strips from the hopper; a change in the guiding means for the partition strips as they move on the conveyor; and the use of a motor rather than a manually operated wheel to raise or lower the dome on the assembler.

The total number of American's drawings used by defendants—either by reference thereto, directly or through use of a copy or tracing thereof—cannot be determined. The evidence demonstrates, and it is not disputed, that the prints given to Engle by Cunningham beginning in June 1956 were used in the construction of units Nos. 1 and 2 at Mumpers; and that some 43 of the drawings bearing U. S. Partition title block and prepared after March 1, 1957, by reference, copying, or tracing of American's drawings were used in the building and conversion of six additional units acquired by defendants.

In November 1955 Fox River, at the request of Cunningham, delivered to American's Milwaukee plant some 369 patterns belonging to American. On their arrival they were stored in American's warehouse under lock and key. In May 1956 Engle, at the instigation of Cunningham, surreptitiously took 80 of these patterns relating to American's Dauber-Vail equipment and delivered them to three foundries located in the Milwaukee area where he ordered castings to be made from them.

Following the completion of this foundry work, Engle returned the patterns to American's warehouse, having directed that the castings made from them be delivered and their charges be invoiced to Mumper which had been furnished with funds for this purpose by U. S. Partition. In all, in excess of 1,978 cast parts were so prepared, a number sufficient to supply such castings for ten Dauber-Vail strippers and six semi-automatic Dauber-Vails. Thirty-four of these 80 patterns were for Schroeder hopper-feeder parts. Defendants are presently using 332 of such castings in their machinery units Nos. 1 and 2. These are castings from approximately 62 per cent of all of American's Dauber-Vail patterns.

Defendants' use of American's patterns resulted in a time saving and in lower costs to defendants in building their units Nos. 1 and 2. Additionally, the measurements from said castings prepared from American's patterns have facilitated the construction and conversion of additional units of U. S. Partition machinery.

In explanation of their use of American's drawings, as well as use of improvements in American's machinery (discussed below), defendants rely on testimony by Millard and Cunningham as furnishing a background to the re-employment of Cunningham by American in May 1949. These men testified that American was having production problems and difficulties in obtaining effective operation from its machinery. As a condition to his re-employment, Cunningham requested that Millard agree that if at any time in the future Cunningham were to leave American's employ, he was to be free to use for his own purposes any ideas with respect to any partition machinery developments then known by him or thereafter

effected at American under his guidance and direction. They testified that Millard acceded to these conditions. This alleged agreement was not communicated to Clinton.

3. *Solicitation and Use of American's Employees.*

Beginning in June 1956, after being approached by Cunningham, Ervin Bickelhaupt, Erven Mielke, and Frank·Klafka went to work at Mumper as machinists to aid in the construction of partition machinery for U. S. Partition under the direction of Cunningham and Engle. Bickelhaupt had been a machinist at American's plant in Milwaukee until June 1, 1956; Mielke had been a machinist at American's Milwaukee and Bound Brook plants and was American's plant superintendent of its Traver operation in Chicago when he resigned on June 17, 1956; and Klafka had been a machinist at American's Milwaukee plant prior to terminating his employment with American on July 10, 1952. Neither Bickelhaupt nor Mielke discussed the fact that they were leaving to go to work for Mumper with anyone at American other than Cunningham and Engle. Mumper billed U. S. Partition the total sum of $16,821.-72 for the work of these three men during the period from June to December 1956.

Late in 1956, these three men together with Edward Lowrey, a mechanic who had been employed at American since 1951, and Elroy Shelley, who had been American's shipping foreman since 1951, began work at U. S. Partition.

In June 1956 Mrs. Kathryn Hansen, who was American's chief accountant as well as its assistant secretary-treasurer and Milwaukee office manager, performed certain services for U. S. Partition, such as making bank deposits and purchases and attending to its weekly payroll without receiving any salary therefor, after being informed by the defendants that they planned to establish their own partition manufacturing enterprise.

Following the resignations of Millard, Cunningham, and Chernin from American, the following former employees of American became employees of U. S. Partition: Frank Meinert, American's plant superintendent; Nancy Torcivia and Virginia Berntson, Chernin's and Cunningham's secretaries, respectively; Sidney Friedlander, American's salesman with the title of national accounts executive; Maurice Wolkomir, part-time salesman for American; Richard Shaw, American's Milwaukee sales manager; and George Juris, American's general manager of its Bound Brook, New Jersey, plant, who unsuccessfully attempted to induce three other American employees to leave with him and to establish through a fourth employee a source into American's confidential pricing and sales data. Some of these employees received wage increases, others sustained reductions, and still others remained at approximately their prior wage level. There is no evidence that any of the employees of American, including the individual defendants, were restricted pursuant to any contract or agreement from terminating their respective employments with American at any time or from accepting employment elsewhere with a competitor of American.

With the departure of Chernin, Friedlander, Wolkomir, and Shaw, American's only remaining salesman connected with its Milwaukee plant whose employment antedated January 7, 1957, was Arthur Zelt who had suffered a heart attack in November 1956 and did not return to work until January 19, 1957, and then on a restricted part-time basis. On February 28, 1957, Zelt resumed work on a full-time basis.

4. *Appropriation of Customer Good Will.*

During the eight months of May through December 1956, there was charged to and paid by Standard Brands as travel and promotion expense incurred with reference to American the sum of $68,458. Included among such moneys was the sum of approximately $29,500 for the purchase of gifts to customer personnel; some $8,500 spent in restaurants and hotels; and an outlay of $4,800 expended on a three day customer outing—

June 29 to July 1, 1956—at Nippersink Lodge in Wisconsin, hosted by Millard, Cunningham, and Chernin, during which they entertained some forty officials of American's customers and their wives. This entertainment continued a practice established by American in 1952. Apart from Millard, Cunningham, Chernin, and their wives, the only other American personnel present at this three day outing were Sidney Friedlander and Mrs. Kathryn Hansen and their respective spouses. Acknowledgments addressed to Millard and Chernin from the recipients of the hospitality and largess dispensed by American's sales personnel indicate what may be characterized in some instances as profuse gratitude.

Millard testified that he believed the gifts and entertainment would result in an attitude of good will on the part of the recipient towards Millard, Chernin, and Cunningham.

American's partition sales from its Milwaukee plant to nine brewing companies dropped from an annual average of $662,400 in 1954–1956 to an annual average of $40,000 in 1957–1960. American's production force in Milwaukee, which numbered 125 on January 1, 1957, was reduced to 79 four years later.

Following its entry into the field of manufacture and sale of partitions which began in late January of 1957, in competition with American, U. S. Partition was able to secure for itself a substantial portion of the patronage of customers in the Midwest area formerly enjoyed by American.

Chernin, in letters submitting quotations to customers during the course of the year 1957, informed said customers generally that a group of individuals had severed their relationship with American and were now functioning as U. S. Partition. The following paragraph is typical of the explanation offered the customers for this move:

"Briefly, the reason for the above individuals severing their relations was due to the fact that since Standard Brands acquired the American

Partition Company, during a period of 16 months of ownership they never once demonstrated or manifested any interest in the human element. There was never any concern or discussions related to the welfare or future of the personnel, individually or collectively. On this basis of day to day insecurity we, individually and collectively, decided that it was time to attempt to build, in some small measure, a future for ourselves in order to attempt to fulfill the monetary and morale obligations which we as 'individuals' have to ourselves and families."

In addition to the four specific areas of claimed misconduct related above, Standard Brands alleges that there were other instances of breaches of duty to be considered in this action. Evidence relating to certain wastepaper transactions engaged in by Millard, Cunningham, and Chernin, using U. S. Partition as a corporate vehicle for the enterprise, showed that these defendants purchased wastepaper from American, sorted it, and resold it as partitions to breweries at profit. Physical handling of the product involved was performed by employees of American without reimbursement to American. Neither Clinton nor Standard Brands was informed of this enterprise which was terminated with the advent of the Clinton-Standard Brands arrangement. The decision in Standard Brands, Incorporated v. Millard, 7 Cir., 1960, 273 F.2d 882, that the cause of action in respect to this alleged misconduct lies with Clinton, which is not a party plaintiff in the instant case, renders this claim not actionable herein. This evidence was admitted only for whatever value it may have in showing a background from which may be inferred a motive for the actions as to which Standard Brands has a cause of action.

Furthermore, Standard Brands claims that defendants Cunningham and Chernin wrongfully received certain payments on April 30, 1956, which were used to finance their competitive enterprise. In 1952 American (and Clinton) entered

into agreements with Cunningham and Chernin, by the terms of which the former agreed to pay Cunningham and Chernin each twice their annual salary; i. e., the sum of $34,500, if American were to be sold during the next three years, which contract had the approval of Clinton's chairman of the board and of its executive committee. This contract expired by lapse of time on September 17, 1955. On November 29, 1955, Millard executed another written contract with Cunningham and Chernin, duplicating the terms of the 1952 agreement and increasing the lump sum to be paid from $34,500 to $40,000, commensurate with the salary increases of Cunningham and Chernin. Millard testified that he had permission of Clinton to sign the latter agreement prior to the initialing of the agreement of sale between Clinton and Standard Brands, and that he knew that the men would receive their payments when the contract of November 29, 1955, was signed.

Standard Brands further claims that Cunningham appropriated for defendants' benefit a waxing process used by American, that he withheld from American improvements he devised on American's machinery during the course of his employment with plaintiff, and that he shared the benefit of said improvements with the other defendants.

These improvements of the feeder mechanism construction of the hopper involve a vacuum ejector system in removing partition strips and placing them on a conveyor for movement to the assembly zone. They were conceived by Cunningham during the latter part of 1956. Defendants did not inform plaintiff of these improvements which were incorporated into U. S. Partition units Nos. 1 and 2. In July 1957, plaintiff was informed that U. S. Partition was using such a system from reports made to its employees by employees and former employees of U. S. Partition and others. In December 1957, a vacuum system for removing partition strips from the hopper was adopted on the Dauber-Vail semi-automatics of American.

Further pertinent evidence revealed that U. S. Partition, in addition to the two units of semi-automatic Dauber-Vail machinery constructed in 1956 at Mumper at a cost of $35,000 each, had to the time of trial placed six further units of such machinery in operation. These additional units were acquired by purchase and further construction and have been converted and improved by defendants to a production capacity of 4,000 sets of partitions per hour.

At the present time, U. S. Partition is a principal competitor of Standard Brands in the manufacture and sale of partitions produced by said machinery. Through its over-all purchasing department, Standard Brands has rendered assistance to American sales and purchases since January 1957 by resorting to use of its purchasing power in fields other than the partition industry.

As a comprehensive remedy for the alleged breaches of fiduciary duty constituting its cause for unfair competition, Standard Brands has requested the court to impose a constructive trust upon the shares of stock in U. S. Partition, now or heretofore owned by the defendants, and to direct the defendants to assign and transfer to plaintiff all such shares upon such terms as are equitable. Additionally, Standard Brands requests assignment of ownership of Patent No. 2,984,480, issued to Cunningham on May 16, 1961, covering the feeder construction apparatus adapted by him to the partition manufacturing machinery of U. S. Partition.

■■■■ The actionable wrongs alleged here are premised upon violations of fiduciary duty by the managerial employees of American. Every agent owes his principal the duty of undivided loyalty. During the course of his agency he may not undertake or participate in activities adverse to the interests of his principal. Bank of California v. Hoffmann, 1949, 255 Wis. 165, 171, 38 N.W.2d 506, 39 N.W.2d 280; Central Ry. Signal Co. v. Longden, 7 Cir., 1952, 194 F.2d 310, 318; Hunter v. Shell Oil Co., 5 Cir., 1952, 198 F.2d 485, 488, 489. In the absence of an

agreement to the contrary—and there is no evidence of any contractual limitations binding on these defendants—an agent is free to engage in competition with his principal after termination of his employment. Furthermore, he may plan and develop his competitive enterprise during the course of his agency provided the particular activity engaged in is not against the best interests of his principal. See Keiser v. Walsh, 1941, 73 App. D.C. 167, 118 F.2d 13, 14; Red Top Cab Co. v. Hanchett, D.C.N.D.Cal.1931, 48 F. 2d 236. Protection of the principal's interest requires a full disclosure of acts undertaken in preparation for entering into competition. Faultersack v. Clintonville Sales Corp., 1948, 253 Wis. 432, 435, 34 N.W.2d 682; Central Ry. Signal Co. v. Longden, supra, 194 F.2d at page 318.

■ Upon lawfully entering into competition with his former principal, an agent may utilize such inventive ability and talents as he possesses provided he does not use adversely to his principal secret and confidential information developed and acquired during the course of his employment and, further, provided he has not agreed to a contractual limitation upon the use of his own inventive talents following termination of the agency. There is no evidence of such a restriction imposed on defendants.

■ Applying the criteria of these well-established general principles to the facts of this case, the court finds that the defendants have violated the fiduciary duties they owed to Standard Brands. This unlawful conduct commenced after defendants agreed during the spring of 1956 to prepare for engaging in a competitive enterprise. It involves their acts in procuring the means to fashion their enterprise by appropriation of their principal's property without full disclosure as to the nature and purpose of their activities to Standard Brands.

American's drawings furnished secret and confidential information as to inventions and details of manufacture of American's machinery. The admitted utilization by the defendants of this ex-clusive property of Standard Brands—and it is immaterial here whether these drawings served as reference for sketches, as direct source, or as a source for copies or tracings—to facilitate and speed the construction of defendants' partition manufacturing machinery, U. S. Partition units Nos. 1 and 2, during the course of defendants' employment at American, was wrongful. The continued use of said drawings following termination of defendants' agency as shown by the record is also wrongful. Further, defendants' use and retention of drawings prepared by American relating to the Glendale property also constitute misappropriation of plaintiff's property.

Defendants claim a right to their utilization of Cunningham's machinery improvements and ideas pursuant to an agreement between Millard and Cunningham conditioning the latter's re-employment by American in 1949. Although it was Millard's custom to discuss matters of import in the management of American with his superiors at Clinton, this agreement was not communicated to said superiors. An understanding of this nature—if Cunningham's and Millard's testimony in respect thereto is to be believed—cannot be interpreted as encompassing a right to engage in disloyal acts during the course of defendants' employment, such as the misappropriation of American's drawings for the purpose of enabling defendants to enter into effective competition with their former principal almost simultaneously with termination of their employment by an unfairly gained advantage in time and money.

■ The fact that Cunningham, Engle, and others could have constructed U. S. Partition's units Nos. 1 and 2 without resort to American's drawings does not justify defendants' appropriation of their employer's property in the pursuance of an adverse interest.

The court's decision as to the wrongfulness of defendants' appropriation and utilization of American's drawings applies equally to the taking and use of American's patterns to fabricate castings

for parts of U. S. Partition's units Nos. 1 and 2. The wrongful use of these patterns also continued beyond the period of defendants' employment in that parts fabricated therefrom furnished measurements and details facilitating the construction and conversion of U. S. Partition's later acquired machinery. Use of the patterns substantially contributed to the saving in time and money in placing defendants' first units in operation.

■ Similar principles govern defendants' utilization of American's employees Hansen, Bickelhaupt, Mielke, Lowrey and Shelley for the purpose of facilitating and speeding defendants' entry into business in competition with American, including the construction of U. S. Partition's units Nos. 1 and 2 adversely to the interest of defendants' employer. Defendants were the superiors of these persons at American. Bickelhaupt, Mielke, Lowrey, and Shelley did not inform American of their reasons for leaving, and Mrs. Hansen did not disclose that she was performing outside activities on behalf of the defendants and adverse to American. Under these circumstances defendants' solicitation and utilization of American's employees must be deemed wrongful.

■ Defendants' sales promotion and customer solicitation practices also constitute a wrong to plaintiff. The entertainment afforded and gifts bestowed on the purchasing or other agents of American's customers by the defendants appear to have been consistent with American's practices of prior years. Defendants owed a duty of disclosure after they had formulated their plans to prepare for engaging in competition. It is not disputed that some customer good will adhered to the immediate dispensers of American's bounty, as shown by the effusive letters of gratitude from the recipients. These activities were wrongful because defendants had not informed American or Standard Brands of their plans to engage in a competitive enterprise and of the steps already undertaken in the accomplishment of their objective. Had plaintiff known of defendants' competitive plans prior to the undertaking of these promotional activities, it would have had a choice as to the wisdom of expending considerable sums of money under these circumstances.

■ Standard Brands' claim that defendants wrongfully withheld from it improvements of American's machinery developed by Cunningham during the course of his employment is supported by the evidence. It is admitted that these improvements were conceived during the latter part of the year 1956, and that their practical application was worked out during the last six weeks of that year by Engle and Mielke under Cunningham's supervision. These events took place during Cunningham's term of employment with American when he not only was under a duty not to act against the best interests of American but was further under a direct obligation to give his employer the benefit of any improvements devised by him. The incorporation of these improvements on U. S. Partition's units Nos. 1 and 2, constructed in 1956 and placed in operation beginning in January 1957, refutes defendants' claim that these improvements were not sufficiently developed while Cunningham was at American so as to require their disclosure and utilization for the benefit of American. Defendants' withholding of these improvements constitutes an actionable wrong.

Prior to submission of post-trial briefs and arguments in this case, plaintiff asserted no patent rights in respect to these improvements. A patent relating thereto was issued to Cunningham in May 1961, and it may be assumed that application for the patent was pending during the course of this litigation. American has been using a vacuum system on its machinery since December 1957. On the basis of the record and affidavits furnished by plaintiff after trial, the court cannot determine what, if any, rights plaintiff may have in respect to this patent.

Other allegedly wrongful acts of the defendants; i. e., the acquisition of the

Glendale property, the solicitation of employees after defendants left American, and the securing of financing for their competitive enterprise, are not actionable for the reasons set forth hereafter.

■ Although information of the availability of the Glendale property was withheld from Standard Brands, plaintiff has not established that this plant site was so suited to American's needs and purposes that defendants' acquisition thereof for their own purposes deprived Standard Brands of a corporate opportunity. Factors bearing on this conclusion are the relatively small size of the Glendale property plant, its availability for purchase rather than lease, and American's continued policy of leasing its manufacturing and storage premises. Furthermore, defendants initiated the acquisition prior to their decision to prepare a competitive enterprise and prior to the Clinton-Standard Brands agreement as to the sale of American.

■ Defendants committed no wrong in offering employment to certain of American's personnel after defendants resigned from American. Standard Brands has not sufficiently established that the solicitation of these persons actually occurred prior to January 7, 1957, or that this was part of the execution of defendants' competitive scheme. Said personnel left American's employ at a time when defendants were no longer their superiors in whose power it lay to influence their choice.

The agreements providing for substantial payments to Cunningham and Chernin in the event of the sale of American, acquiesced in and performed by Clinton— and it may be assumed that Clinton could readily have informed itself of the written renewal of this agreement after the occurrence of the condition calling for the payment—constitute no actionable wrong as to Standard Brands. Cf. Standard Brands, Incorporated v. Millard, 7 Cir., 1960, 273 F.2d 882.

The record here reveals a fortuitous combination of wrongful conduct and other activities, some of which have not been proven as actionable, as, for example, the mass exodus of American's employees, the convenient acquisition of a plant site for the manufacturing needs of U. S. Partition, and the securing of necessary financing. This combination, in conjunction with defendants' undoubted skill, perseverance, and industry, resulted in the development of a manufacturing enterprise facilitated by use of plaintiff's property and employees and concealed from plaintiff at a time defendants owed undivided loyalty to American. This manufacturing enterprise was ready and able to begin actual competition with American almost simultaneously with defendants' resignations from American.

Standard Brands (and Clinton before it), apparently relying on the good faith of its employees, took none of the measures available to it to protect itself against possible disloyal conduct or injury at the hands of its agents. It failed to secure agreements not to compete or requiring the assignment of inventions and improvements. In fact, plaintiff allowed American's former officials great latitude in the management of the partition manufacturing concern's affairs. Standard Brands' reliance on the good faith of its employees in the fulfillment of their duties was misplaced.

Concurrently with the commencement and continued operation of U. S. Partition in the manufacture and sale of paper product partitions, American has sustained most serious losses as illustrated by the reduction in average annual sales to Midwest breweries and in its productive force.

The court finds that defendants' disloyalty to American was the substantial cause of American's past losses. These losses would not have reached their almost crippling proportions had defendants fairly engaged in competition by utilizing their skills and industry without resort to the conduct found wrongful to gain an unfair advantage in time. Defendants' secret misappropriation and use of plaintiff's drawings, patterns, and

confidential information and utilization of American's employees; their withholding of machinery improvements and solicitation of customer good will, all committed in pursuance of a plan formed and principally executed while defendants were in the employ of plaintiff without revealing to their employer the adverse nature and hostile purpose of their activities; and the continuing, indirect use of drawings, patterns, and information after termination of their agency call for the award of equitable relief in the form of an injunction and accounting, as well as damages, although not of such drastic reach as demanded by Standard Brands. Smith v. Dravo Corp., 7 Cir., 1953, 203 F.2d 369, 378.

In seeking to restore American's market, Standard Brands has resorted to its massive purchasing power in fields other than the partition industry. The record does not show that plaintiff's application of economic pressure has seriously interfered with free competition between U. S. Partition and American. The doctrine of unclean hands under these circumstances is not available to defendants to prohibit the award of equitable relief.

The computation of the amount of plaintiff's recovery in respect to the accounting and damages is postponed until adjudication of plaintiff's and defendants' remaining claims. Because of the complicated nature of this computation and the crowded state of the court's calendar, this question will be referred to a special master pursuant to Rule 53(b) of the Federal Rules of Civil Procedure. Counsel for the parties are requested to submit briefs setting forth their views as to the directions to be given the special master.

The stipulation of facts submitted by the parties is hereby adopted as the court's findings of fact. Additional findings and the court's conclusions of law are as set forth in this opinion in compliance with Rule 52(b) of the Federal Rules of Civil Procedure.

In accordance with the court's findings and conclusions,

It is hereby ordered, adjudged, and decreed that the individual defendants have violated the duty of loyalty owed to plaintiff during the term of their employment with American and have continued to utilize property misappropriated from American following termination of their agency, using the corporate defendant, U. S. Partition, as a vehicle for their wrongful conduct to the defendants' gain and to plaintiff's consequent injury. Said individual defendants and the corporate defendant are hereby permanently restrained and enjoined from utilizing U. S. Partition's machine units Nos. 1 and 2 or permitting their use or the use of any part thereof for the purpose of manufacture or sale of partitions.

It is hereby further ordered, adjudged, and decreed that said individual defendants and corporate defendant are hereby permanently restrained and enjoined from utilizing any of the castings made from patterns taken from the premises of plaintiff's American Partition Company, or permitting their use or the use of any part thereof in connection with the manufacture or sale of partitions, or reproduction of other castings.

It is hereby further ordered, adjudged, and decreed that said individual defendants and corporate defendant are hereby permanently restrained and enjoined from utilizing any of the drawings (including prints, tracings, or copies thereof) described in the stipulation of facts as Group A, Group B, or Group C drawings, any prints, tracings, or copies of drawings made from or with reference to any of the drawings described in the stipulation of facts as Group A, Group B, or Group C drawings, and defendants are hereby ordered to surrender to plaintiff all such drawings, prints, tracings, or copies of drawings.

The clerk is hereby directed to enter judgment of injunction in accordance herewith for the plaintiff on its claim for unfair competition. The balance of the

judgment relating to damages and other issues in the case, together with the taxation of costs, is postponed pending final disposition.

## On Post-Trial Motion.

Plaintiff has brought this post-trial motion for further hearing to determine its rights in a patent issued to defendant, Donald F. Cunningham.

■ The patent in issue, No. 2,984,-480, relates to a vacuum system of release and to conveyor guiding means of the partition machinery used by the parties in manufacturing their products. On January 22, 1958, while the instant action was pending, counsel for defendant advised counsel for plaintiff of the intention to apply for a patent. The application for said patent was filed on January 28, 1958. The patent was issued to Donald F. Cunningham on May 16, 1961, after conclusion of the trial of the unfair competition claim of the case but prior to the filing of post-trial briefs and final arguments.

Plaintiff relies on contractual and equitable grounds in seeking assignment of the patent. Assuming arguendo that the claims of the patent in issue embody the invention of improvements of the partition manufacturing machinery which this court determined to have been wrongfully withheld from plaintiff, it does not follow that plaintiff is entitled to exclusive legal title thereto. Bearing in mind the employment and contractual relationship of the parties and their conduct with respect to the assignment of a prior patent by Cunningham as shown by the evidence in the case, the court does not find that it appears that both Cunningham and his employer understood that plaintiff was to have the exclusive benefit of any invention Cunningham might make in the course of his employment.

■ Wisconsin law grants the employer the privileges and benefits of a license—a shop right—in the invention under the circumstances of this case. It does not preclude the employee from all right in his invention. Fuller & Johnson Mfg. Co. (Limited) v. Bartlett, 68 Wis. 73, 31 N.W. 747 (1887); Barlow & Seelig Mfg. Co. v. Patch, 232 Wis. 220, 286 N.W. 577 (1939). Under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the substantive rights of the parties in this action must be determined in accordance with applicable state law. Cases from other jurisdictions granting the employer greater rights in comparable situations are not controlling.

■ Defendant's wrongful conduct in withholding the benefits of his invention from plaintiff does not of itself furnish a basis for assignment of the patent on equitable grounds. In Dowse v. Federal Rubber Co., 254 F. 308 (N.D.Ill.1918), the inventor was the "alter ego" of the employer, the application for the patent was filed during the course of the employment, and the patent involved the life of the corporation. In National Wire Bound Box Co. v. Healy, 189 F. 49 (7th Cir. 1911), the invention related to the machine which was central to the success of the common enterprise of the parties who were deemed co-agents as to their undertaking. Of interest is the concurring opinion in the case wherein Circuit Judge Seaman would have based the decision on express contract to assign. In these cases, as well as in Diversey Corporation v. Mertz, 13 F.Supp. 410 (N.D. Ill.1936), an important factor in deciding that the employee held the patent in trust for his employer appears to be the finding that the employee intended that his employer should own the invention.

A similar intention cannot be ascribed to Cunningham merely on the basis of his employment, without express contractual obligation to assign patents, and on his voluntary assignment of one prior patent.

Lastly, the controlling law as well as the circumstances shown in North Branch Products, Inc. v. Fisher, 131 U.S.P.Q. 135 (1961), where the court decreed assignment of patents on equitable

.grounds, serve to distinguish the case. There the inventions were developed, the patent applications were filed, and the patents issued all during the course of the employment with the employer defraying a portion of the costs thereof.

The authorities discussed above do not support assignment of the patent in issue on legal or equitable grounds under the circumstances of the case as established by the parties' stipulations and the evidence on the trial or submitted on this motion.

Plaintiff's counsel has filed an affidavit stating that it is his belief that the patentable claims of Patent No. 2,984,480 embody the invention conceived and partially developed by Cunningham during the course of his employment with plaintiff. Cunningham has submitted an affidavit opposing said counsel's opinion. Plaintiff has used improvements similar to those devolped by Cunningham and constituting the claims of the patent in issue on its machinery since 1957. It does not now allege that defendant has protested or interfered with plaintiff's utilization of said improvements.

The scope of the invention embodied in the patent as compared with that of the improvements developed by Cunningham during the course of his employment with plaintiff cannot be decided on the basis of opposing affidavits and explanatory briefs. This issue could have been submitted for determination at the trial of the unfair competition claim since the patent as issued is based on the claims stated in the application filed in January 1958.

In view of the court's opinion that plaintiff's rights in the patent, insofar as they are based on the inventions made by Cunningham during the course of his employment with plaintiff, amount to a license rather than an exclusive right and, further, in light of the undisturbed utilization of similar improvements by plaintiff on its own machinery, the motion for further hearing and for decree of assignment of the patent in issue is hereby denied.