[S. F. No. 21627. In Bank. Mar. 17, 1966.]

BANCROFT-WHITNEY COMPANY, Plaintiff and Appellant, v. ADA GLEN, as Special Administratrix, etc., et al., Defendants and Respondents.

Charles E. Hanger and Brobeck, Phleger & Harrison for Plaintiff and Appellant.

Bronson, Bronson & McKinnon, Edgar H. Rowe, Gibson, Dunn & Crutcher and Dean C. Dunlavey for Defendants and Respondents.

MOSK, J.—This is an action for breach of fiduciary duty by a corporate officer and for unfair competition. Plaintiff, Bancroft-Whitney Company, engaged in publishing law books, is a California corporation with its principal place of business in San Francisco. Defendants are Judson B. Glen, the former president and a director of plaintiff,[1] Matthew Bender & Co., a New York corporation which also publishes lawbooks (hereinafter called Bender Co.), and John T. Bender (hereinafter referred to as Bender), the president of Bender Co., who is sued individually and in his official capacity.[2] The complaint alleges as follows:

Over the years plaintiff has spent large sums of money to develop a highly skilled staff of legal researchers and editors and, as of December 1, 1961, it employed more than 50 persons in these capacities in San Francisco. In July 1961 Glen, while ostensibly serving as president of plaintiff, and defendants Bender and Bender Co. commenced negotiations for the purpose of establishing a western division of Bender Co.

During November 1961, Glen, without resigning or giving notice to plaintiff or its officers, directors, or shareholders, signed a contract with Bender Co. to become president of the contemplated western division, commencing on or about January 1, 1962. Beginning in July 1961 and thereafter, defendants joined in a concerted effort to obtain a staff of editors and other personnel for the proposed new western division and, using misrepresentations and half-truths, intentionally interfered with plaintiff's advantageous contractual relationships and surreptitiously sought to entice away carefully selected members of plaintiff's executive staff and working force.

---

[1] Glen died in January 1964, after the trial was concluded, and the special administratrix of his estate has been substituted as a defendant.

[2] Three former directors of plaintiff, Jules R. Kalisch, Arno Lahti, and Gordon Baker, were originally joined as defendants, but the action was dismissed as to them on plaintiff's motion.

Using to full advantage the inside knowledge and confidential business information provided by Glen, who continued to occupy a position of trust with plaintiff, defendants solicited more than 20 officers, directors, and trained employees of plaintiff. On and subsequent to December 15, 1961, more than 15 persons, including officers, directors, researchers, and editors left plaintiff's employ without notice and entered the employ of the newly created western division of Bender Co. When the company qualified to do business as a foreign corporation in California on January 5, 1962, the great majority, if not all, of its employees were persons who had just previously worked for plaintiff under the supervision of Glen.

The publishing schedules, including proposed formats, types, and titles of publications, dates of publication, planned future publications, as well as customer lists, relative value of customers, and other methods and techniques of doing business are closely kept secrets of lawbook publishers, and Glen, as the once-trusted fiduciary of plaintiff, became acquainted with its trade secrets and confidential business information. At the request of the other two defendants, Glen disclosed this valuable information to them, to the damage of plaintiff.

It is further alleged that the acts of Glen, including the enticement away of plaintiff's officers, directors, and trained employees, and the disclosure of trade secrets and confidential business information of plaintiff to its competitors, violated the fiduciary duties owed to plaintiff by him as an officer or director and that these acts were done for the purpose of crippling or destroying plaintiff and to provide advantage to defendants at the expense of plaintiff. The acts of the other two defendants, in subverting trusted officers and directors of plaintiff and using them and confidential and secret information provided by them to raid plaintiff's staff and entice away plaintiff's employees constitute unfair competition and were performed for the purpose of crippling and destroying plaintiff.

It is also alleged that defendants acted with malice, fraud, and oppression, and the complaint prays for general damages, punitive damages, and an injunction to restrain defendants from further approaching plaintiff's employees for the purpose of inducing them to leave plaintiff's employ and from disclosing trade secrets or confidential business information to Bender Co.

After a lengthy trial, the court, sitting without a jury, found in favor of defendants. It refused injunctive relief and

held that Glen did not breach his fiduciary duties, that defendants were not guilty of unfair competition, and that no trade secrets or confidential business information were disclosed by Glen or used by the other defendants. It also found that defendants were not guilty of any of the specific wrongful acts alleged in the complaint.[3]

It may be helpful at the outset of this long and complex chronicle of events to describe the issues involved in the controversy. Plaintiff does not seriously contend that Glen acted improperly in seeking employment with Bender Co. or that the other defendants are liable because they hired Glen, and no damages are sought for the departure of Glen from plaintiff's employ. It is contended, however, that Glen breached his fiduciary duties by his conduct leading up to the employment of the other persons who resigned from positions with plaintiff, and the gravamen of the action against Bender and Bender Co. relates to their role in cooperating in Glen's breach for the purpose of obtaining the employment of these persons by Bender Co. ▮ We hold, for the reasons hereinafter stated, that the evidence shows as a matter of law that Glen violated his duties to plaintiff and that the other defendants, having cooperated in and reaped the fruits of his violation, are guilty of unfair competition.[4]

The record in this case consists of several thousand pages. The facts leading up to the employment by Bender Co. of Glen and Gordon Baker, plaintiff's sales manager, form the backdrop against which the employment of plaintiff's other personnel occurred. The summary of these events is taken sub-

[3]As to Glen, the court found that he did not join in a concerted effort with any other defendant to obtain editors for Bender Co., that he did not interfere with plaintiff's contractual relationships or entice away any of its employees, officers, or directors, that he did not use half-truths or any wrongful means to entice away plaintiff's employees, that he never solicited any officer, director, or employee of plaintiff who joined Bender Co., and that he did not disclose trade secrets or confidential business information to Bender. As to Bender and Bender Co. the court found that they did not wrongfully interfere with plaintiff's contractual relationships or entice away any of plaintiff's employees using half-truths or anything else improper, that they did not solicit any officer, director or employee of plaintiff using inside knowledge or confidential business information of plaintiff, that they did not use any officer of plaintiff to entice employees or raid plaintiff's staff, and that they did not subvert any officer or director of plaintiff. The court also found that none of the defendants performed any act for the purpose of destroying or crippling plaintiff or for the purpose of wrongfully advantaging himself at plaintiff's expense, and that none of them was guilty of malice, fraud or oppression.

[4]Plaintiff appears to have abandoned its prayer for injunctive relief on appeal. The issue of an injunction to prevent Glen from revealing trade

stantially from the trial court's findings, although a few additional details from the transcript have been inserted for the purpose of clarity. The court made very few factual findings concerning the employment of the other personnel of plaintiff by Bender Co., however, and the evidence concerning this significant phase of the case, together with those few findings which relate to it, is set forth separately.

### The Employment of Glen and Baker by Bender Co.

The majority of the stock of plaintiff corporation is owned by the Lawyer's Co-Operative Publishing Co. (LCP), whose principal place of business is Rochester, New York. Glen was employed by the parent company as an editor from 1938 until 1949, and in 1949 he became the editor-in-chief of plaintiff. From 1958 until his resignation on December 15, 1961, he was also president of plaintiff, chairman of the executive committee of plaintiff, and chairman of the product planning committee of LCP. In April 1960, Thomas Gosnell became president of LCP and exercised direct control and domination over much of the actual business operations of plaintiff. Glen and Baker thereafter became dissatisfied with their employment.

Prior to 1961, Bender Co. desired to expand its operations in California. In May of that year Bender directed William Vanneman, a vice president of Bender Co., to attempt to verify circulating reports that Glen was unhappy in his position with plaintiff. On May 12, 1961, Vanneman reported orally and in writing to Bender that he had not been able to confirm the rumors of dissatisfaction in his discussions with Glen, but stated that he had heard from the president of another subsidiary of LCP that Bender could create a substantial western operation using plaintiff's personnel. Bender testified that he discarded this suggestion.

Nevertheless, on July 10, 1961, Bender instructed his assistant, Joseph Billo, to contact Glen in San Francisco privately to explore further the possibilities covered in the Vanneman report. After a meeting with Glen at his office in San Francisco, Billo reported to Bender that Glen had reached retire-

---

secrets of plaintiff is, of course, moot by reason of his death, and there is no claim in the briefs that plaintiff is entitled to an injunction preventing Bender and Bender Co. from offering jobs to plaintiff's present employees. There is, however, an argument in one of plaintiff's briefs that, apart from the question of Glen's breach of fiduciary duty and Bender's cooperation therein, Bender and Bender Co. are liable in damages for systematically inducing plaintiff's personnel to leave its employ. We do not reach the merits of this argument in view of our conclusion that defendants are liable on the theory of a breach of fiduciary duty by Glen.

ment age, that his pension had vested and he was open to offers, that he would consider a change of employment if he could build up his estate and direct the new operation himself, that he had been asked to stay on in plaintiff's employ for five to seven years,[5] and that, despite feelings of loyalty to plaintiff, he could be swayed. Bender wrote Glen at his home, arranged to meet him in San Francisco on September 19, and there they discussed the possibility that Glen might head a new western division of Bender Co. following his retirement. They also discussed the need for a sales manager for the new organization, and Glen suggested that Bender contact Gordon Baker, who was the Los Angeles regional sales manager and a director of plaintiff. Glen called Baker and arranged a meeting between Bender and Baker in Los Angeles. At that meeting Baker indicated that he might be interested in serving as sales manager for the new organization, but only if Glen also became associated with it. On October 10 the fact that Bender was interested in hiring Glen and Baker (and a number of editors employed by plaintiff, as will be discussed later) came to the attention of Gosnell, the president of LCP, and other LCP officers. Gosnell met Glen in San Francisco in a series of meetings beginning on October 23, 1961, to discuss the situation with him. Glen testified that at these meetings Gosnell did not ask him about his personal plans, but Gosnell claimed that he asked Glen whether he and Baker had been approached about employment by Bender and that Glen had replied he and Baker were not interested in going to work for Bender Co. More of this meeting is discussed hereinafter.

On November 17, 1961, after further negotiations between Glen, Baker, Bender, and other employees and officers of Bender Co., Glen and Baker signed employment contracts with Bender Co., requiring them to commence work on January 1, 1962. Glen's contract provided that he would share in the profits of the new enterprise. On December 15, 1961, Glen resigned as president and director of plaintiff and as a director of LCP. Baker resigned on the same day, and both men commenced employment with Bender Co. in January 1962.

Before November 16 Glen had personally discussed negotiations concerning his probable future employment by Bender Co. with at least two other directors at LCP, and they did not indicate any objection or reproval of Glen's activities. Glen

---

[5] The normal retirement age set by plaintiff was 65, and employees were required to retire at that age unless the management of LCP asked them to stay on.

had no written contract of employment with plaintiff, his employment was terminable at will by either plaintiff or himself, and he was not required by the terms or particular circumstances of his employment to resign from or give notice to plaintiff or its remaining officers, directors, or shareholders before negotiating for or signing an employment contract with Bender Co. for the purpose of establishing a western division.

Defendants rely on evidence showing that Glen was discontented with his employment, that a number of plaintiff's officers and employees knew of Glen's discontent and were aware of his negotiations with Bender, and that Glen would have been required to retire from his position with plaintiff because he had reached the age of 65. The evidence regarding these matters is not set forth in detail because it is tangential to the primary issues in the case as described above.

### The Hiring of Employees Other Than Glen and Baker

The evidence relating to the hiring of plaintiff's other employees by Bender Co. is substantially uncontradicted and comes, for the most part, from the testimony of Glen and Bender themselves and from documentary evidence in the form of correspondence produced from their files.

Plaintiff employed 56 lawyer-editors, who were organized into four departments. Each department was headed by a managing editor and an assistant managing editor, and four of the editors specialized in indexing. Glen was editor-in-chief. None of the employees or officers hired by Bender had written contracts of employment with plaintiff.

From the first meeting on September 19,1961, between Glen and Bender, Glen had mentioned that a dozen editors might accompany him to the new organization.[6] In subsequent contacts this figure fluctuated between 10 and 15 editors. Indeed, at one point Glen suggested to Bender that he might "take" practically all the personnel in plaintiff's organization, but Bender replied that he did not want them all. Although Bender was not concerned about the origin of the editors to be employed, he knew when he discussed obtaining experienced

---

[6]There is some dispute as to the exact terminology used by Glen in this regard. Bender testified at one point that Glen had said he was going to ''bring'' a whole gang of editors with him, and at another that Glen had said that dissatisfaction was so deep in plaintiff's organization that if he left, a considerable number of editors who were personally loyal to him would want to go with him. Glen testified that he spoke at the September meeting about a dozen editors accompanying him. In a letter from Glen to Bender on November 28 Glen stated, ''I believe that we will start with ten and perhaps as many as fifteen editors.''

editors for the new organization with Glen that "pretty much" the only source in San Francisco to acquire such persons was plaintiff's employees. There were a few editors in San Francisco engaged by other publishers, but "by and large" he expected to get the experienced editors from among plaintiff's personnel.

On or before October 10, 1961, Glen spoke with two of plaintiff's four managing editors about the possibility of their coming to work with the new organization, and both of them expressed interest. Jules Kalisch testified that Glen had offered him a salary of $15,000, a five-year contract, and a percentage of the profits, but that Kalisch felt $15,000 was not enough and Glen then offered him $18,000. Kalisch also asked for a clause in the employment contract stating that, if the other managing editor who was being invited to join the organization received an increase in salary, Kalisch was also to get one, and Glen agreed that this was a fair arrangement. Kalisch's salary with plaintiff was $12,750. Allan Solie, the second managing editor, testified that he was asked by Glen if he was interested in joining the new organization and that Glen offered him a salary of $15,000 a year, a profit-sharing arrangement, and an opportunity to be a member of the board of directors. Solie was earning $11,000 a year. About the middle or the end of November, Glen approached the treasurer of plaintiff, a man named Lahti, and asked him if he was interested in leaving. He was offered a salary of $17,500, representing a $2,500 increase, a five-year contract, and a position as controller of the new organization. Glen's testimony was in substantial agreement with the testimony of these witnesses, except that he stated the salary arrangements he reached with them were "tentative" at first and that negotiations with these men were not completed until the end of November.

As mentioned above, when Gosnell, the president of LCP, became aware in early October that Bender Co. might be interested in employing Glen, Baker, and editorial personnel of plaintiff, he came to San Francisco to discuss the matter in a series of meetings with Glen. There is a sharp conflict in the evidence as to whether Gosnell asked Glen at these meetings whether there was a danger of a raid by Bender Co. on plaintiff's editors. Gosnell testified that he asked Glen if there was any danger that Bender might be taking a group of editors from plaintiff and that Glen replied he didn't think there was any danger of this and thought everyone in the editorial department was happy and pleased. Glen denied that Gosnell asked him specifically about a raid by Bender Co. but ad-

mitted that the subject of a raid by another company was discussed and that he told Gosnell that if there should be a raid on plaintiff's editorial staff he (Glen) would be the first to know about it and "presumably" he would report the matter immediately. Glen testified that his statements did not refer to a raid by a company with which he, Glen, would become associated, because in that case he would not be there to notify anyone. He stated that he knew at the time that if things worked out for him with Bender he would be seeking editors from plaintiff. Portions of the transcript containing Glen's testimony relating to this matter are set forth in the footnote.[7]

Bender testified that Glen told him that Gosnell had been out to see him (Glen), had asked if Bender Co. could be out on some kind of raiding campaign, and that he had told Gosnell that this was not the case.

Another matter Gosnell discussed with Glen during his visit to San Francisco was salary raises for plaintiff's editors. Al-

[7]"Q. Well, the fact of the matter also is, is it not, that [Gosnell] discussed with you the possibility of a raid on Bancroft-Whitney editors?

"A. I don't remember his talking directly about a raid; I think the word was used. I'll tell you how it came up: I had one of these dispensers on my desk, and I had on there a clipping from one of the local papers . . . it was an advertisement for editors. As a matter of fact, when I first saw it, I thought Matthew Bender—they wouldn't do business with me and were out after editors—I don't know now who it was—went to see what company it was that was advertising for editors and found it was the Commerce Clearing House, apparently a program of expansion. And I reached over and showed it to [Gosnell], and I suggested, 'Here is a guy looking for some editors.' And he suggested that we might lose some editors to them. And I said, 'Well, if there is a raid on our editorial staff, I should be the first to know it.'

"Q. All right. Then it is clear, is it not, that the subject of a raid on the editorial staff was discussed between you and Mr. Gosnell at that meeting?

"A. I think that word was used by me, yes.

"Q. It is also true, is it not, that you went a little further than you just stated, and you said that if there was a raid, you would probably be the first to know it?

"A. Yes, if it is a raid.

"Q. On the editorial staff; and you went on and said, 'And presumably I would report it immediately'?

"A. I think I did say that. And I would like to explain that. . . . I wasn't talking, of course, of a raid by any company with whom I might be connected, because I wouldn't be there in that case to notify anyone. I was talking about a raid maybe by the Commerce Clearing House, maybe by the West Coast Publishing Company, if they established a division or branch out in San Francisco. I then said I thought I would notify Mr. Gosnell.

"Q. Well, as I understand it, then, Mr. Glen, if this raid had come from some other source, you would have done all in your power to keep it from happening?

"A. Yes; oh, yes; that would be my job.

though editorial salaries had been under review since the beginning of 1961, Gosnell had ordered another analysis to be made so that he could propose to Glen that increases in salary be given to the editors. The purpose of the suggestion was to head off any Bender Co. raid of plaintiff's editorial staff by maintaining salaries close to the prevailing market rate.

In his meetings with Glen, Gosnell suggested that the salaries of managing editors be raised $2,000 per year, that of assistant managing editors raised $1,500 per year, and that other editors be given raises of $300, $500, or $700 a year, depending upon their experience and competence. Glen told Gosnell that he wished, for purposes of internal administration of plaintiff, to "not make quite such a large jump at this time" but to cut the $2,000 raises for three of the four managing editors to $1,500 and give the full $2,000 raise only to Solie. He also suggested to Gosnell that the salary raises be given in two stages, half immediately, and the other half after January 1, 1962.

Gosnell agreed to the two-step arrangement, and he testified that he was satisfied with the assurances given by Glen before he returned to Rochester. The first-step raises for some of the editors went into effect in November. There is no evidence that Bender knew of the portion of Glen's conversation with Gosnell relating to the raises.

On November 14, Glen flew to New York to attend a directors' meeting of LCP in Rochester. While in Rochester, he told two LCP directors that he might go to work for Bender Co. and stated to one of them that if he decided to leave, Kalisch and Lahti would go with him. On November 16 he flew to New York City, where he met Baker and Bender. On November 17, as noted above, each of them executed five-year employment contracts with Bender Co. and each agreed to commence employment on January 1, 1962. Glen's contract provided that he set up "as soon as feasible" an editorial staff of not less than two experienced managing editors and such additional experienced editors as he believed necessary to carry out the proposed expansion.

At the meeting in New York Bender and Glen discussed the two managing editors who were to be hired. Bender testified he knew that Glen had definite people in mind for the jobs, but could not recall if Glen mentioned the names of Kalisch and

"Q. Well, was your job as president any different if the raid came from you and Matthew Bender?

"A. I wouldn't be president if the raid came from Matthew Bender."

Solie. However, Glen indicated that the salary range for the persons he wanted would run between $15,000 and $17,000 or $17,500. They also discussed the fact that the managing editors would have five-year contracts and agreed that they were to have some share in the profits. Glen told Bender that he must have Lahti (the treasurer of plaintiff) or someone like him, and, although Bender's initial reaction was that hiring Lahti was an unnecessary expense, he deferred to Glen. At this meeting Glen suggested that Bender come to Carmel, where he could meet the two or three people he had in mind as employees and where these persons could meet Bender.

Glen returned to San Francisco, made hotel reservations in Carmel for the meeting, and informed Kalisch, Solie and Lahti about it. Baker learned of the proposed meeting when he was in New York to sign his contract. On November 27 Bender wrote Glen telling him when he expected to arrive for the meeting and assuring Glen that adequate financing for the new organization would be forthcoming. This letter also stated: ". . . the very first thing is to take immediate steps to put together an editorial organization in the following respects: A) Managing Editors B) Experienced Editors C) Selected Trainees. As to group (A) above, Carmel is for that purpose. Then, thereafter, it is your judgment as to when I should be in the picture and when I should be left out of the picture, having in mind that until you actually resign from your present position and the fact of the new organization is known, we will have to be very deft and at least not overlook the possibility of a Fifth Columnist. . . ." The letter went on to report that the stockholders of Bender Co. understood that at the January meeting Glen, Baker, and Lahti would be made officers of the new organization. Bender explained that the reference to a "Fifth Columnist" meant that he didn't want anyone to come to Carmel who wouldn't want to join the new organization because he felt that potential employees would be embarrassed if they attended the meeting and word got back to LCP about it. He also stated he wanted to keep the meeting secret from another competitor.

Bender and his attorney arrived in San Francisco on Friday afternoon, December 1. Glen met them at the airport and drove them to Carmel, taking Solie along. In Carmel they met Kalisch, Baker, and Lahti. Friday night was devoted to the social amenities. On Saturday morning Lahti, Solie, and Kalisch were sitting in the lobby of the hotel when Glen handed them each a copy of an employment contract. He had

drawn these contracts himself and his wife had typed them at home. Glen then gave a copy of each contract to Bender, who was seated with his attorney in a room off the lobby. Lahti, Solie, and Kalisch read their contracts, Bender and his attorney reviewed them, and they were signed with only minor alterations, Bender signing on behalf of Bender Co. Bender did not know before he came to Carmel and was handed the contracts by Glen that the contracts had been prepared, and had not expected to sign contracts in Carmel.

After the contracts were signed, Glen, Solie, and Kalisch proceeded to choose the other editors employed by plaintiff who would be invited to join the new organization. To facilitate this procedure, Glen had brought with him 56 3x5 cards, each designating the name of one of the editors employed by plaintiff, and the editor's salary. Prior to leaving for Carmel he had requested a record of the editors' salaries from plaintiff's personnel department and had entered the amounts on the cards. At the Carmel session, Glen would read the name of an editor and his salary from a card, the three men would discuss his qualities among themselves, and, if it was decided that he should be invited to join, Kalisch would enter his name on a list, place beside it the salary paid to him by plaintiff, and, after a discussion among the three men, a suggested salary to be offered by the new organization.

There is some dispute as to how the suggested salaries were determined. One witness testified that they were 10 percent higher than the salaries paid by plaintiff, and another that the salaries were determined "by guess and by golly." In each case, however, the suggested salary was higher than the editor was receiving from plaintiff. Glen testified that, in making the selection, he wanted competent candidates. In some cases, an editor was known to only one of the men. Glen recommended that two of the four indexers employed by plaintiff be invited to join, and he suggested one or two other persons unknown to the others. Solie tried to pick some of the younger men to avoid the necessity of offering high salaries. In some cases capable editors were rejected because of purportedly undesirable personal habits or because of a record of absenteeism. In one instance a man was passed over because it was reported he had a good chance for advancement with plaintiff. Kalisch testified that there was no discussion about choosing the "cream of the crop" of editors and that editors from one of the departments of plaintiff were deliberately passed over because that group was working on a national publication and they did not want to interfere with its work. At the conclusion

of the meeting, Glen, Kalisch, and Solie had compiled a list of 14 prospects who were to be invited to join. The list also contained the present and the suggested salaries for each candidate.

Bender and his attorney were in the room during a part of the selection process. Bender informed Glen that he (Bender) wished the choice of editors to be made on the basis of their capabilities and their willingness to come to work for Bender Co., and he believed that the selections made followed these requirements. Bender did not participate in making the selections and did not personally know any of the editors mentioned. He did not intervene in the determination of the proposed salaries to be offered the candidates, although he testified he would have done so if the amounts had been unreasonable. He thought the suggested salaries amounted to an increase of about 10 percent over those plaintiff was paying.

After the selection process concluded, there was a discussion as to the method of contacting the candidates. Bender's attorney advised that if persons employed by plaintiff solicited the candidates there was a possibility that a lawsuit would result and that they should keep their "hands off." He advised that the actual contacts be made by someone from Bender Co. and Glen suggested that Vanneman, the vice president of Bender Co., make the solicitations.

Bender and his attorney returned to San Francisco with Glen and during the next day or two they arranged to lease a building previously chosen by Glen for the new enterprise, and opened a bank account. Bender had given Glen a $50,000 check in Carmel for initial expenses.

Glen took the list of candidates home, typed it, and gave it to Bender's attorney. On December 5, Glen wrote Vanneman telling him that he had made hotel reservations for him in San Francisco and asking him to add another editor to the list which had been given the attorney to present to Vanneman. The letter also gave the additional prospect's address and telephone number, designated $7,200 as the present salary, and suggested a $1,000 increase. On December 6, Glen wrote Bender: "Tell Bill [Vanneman] that when he talks to editors neither to tell them that he knows their present salaries nor to ask them what they are. If he asks them what they are the normal reaction will be for them to exaggerate somewhat. This will make the differential less substantial."

Vanneman was ill and Bender designated his assistant, Joseph Billo, to go to San Francisco. Bender telegraphed Glen,

"Joe Billo arriving San Francisco 9th early afternoon. Will phone you home. . . . Indoctrination discussion from you important." Bender explained that by "indoctrination" he meant that Glen should explain to Billo the setup of the new organization and what the working conditions would be.

Billo arrived on December 9. He did not testify, but his deposition was read at the trial. He could not find the list at the time his deposition was taken but when he left New York he had with him the list of candidates, their present salaries, and a suggested salary for each. He met Glen before he contacted the editors, and they discussed some of the persons on the list. There were other meetings with Glen, and Billo also met with Solie and Kalisch. Billo called each of the editors, told them briefly about the new organization, and invited them to be a part of it. Glen had provided a picture of the building which had been leased for the western division, and Billo showed it to each editor. Billo had been given absolute discretion as to salaries by Bender and had offered salaries "comparable" to the Bender Co. editorial salary scale. In most cases he offered more than the amount suggested on the list.

One of the editors contacted by Glen, who did not accept employment with Bender Co., testified that in his meeting with Billo the latter had stated that several editors who worked for plaintiff were being contacted for employment, that "they" considered these editors to be the cream of the legal editors on the West Coast, and that Billo was in a position to offer the editor $900 per year more than he was receiving from plaintiff. Another editor testified that Billo had told him that "they" were selecting all producers," that they were "the cream of the editors on the West Coast," and that the position he would have with Bender Co. would mean an increase in salary of $1,100.

During the period that Billo was soliciting the editors Glen wrote Bender, "I met with Joe Billo last night and he is starting today on his recruiting program. He will keep in touch with us so that he and we here can cooperate to full advantage." On the 11th, the second day of solicitation, Bender telegraphed Billo as follows: "Stengel and Maris eh! The Yanks need you. Tell Jud we'll settle for a championship western division." Bender testified that he did not know what these references meant, but that he thought the telegram was intended to be congratulatory. On December 12 Glen wrote Bender, "We are making fine progress in getting editors. Eleven have committed themselves in our favor. Two will not

come with us. We have not heard from the others. It is now my estimate that we will end up with fourteen editors—not bad for a start."

None of the editors gave Billo an answer at the time of their interview, but subsequently 12 of those contacted by him accepted employment with Bender Co.

After his return from Carmel, Glen contacted the third of the four managing editors employed by plaintiff, Joseph Keesey, and suggested that he accept employment with the new organization.[8] He offered a salary of $16,500 and a percentage of the profits, and prepared a contract, which Keesey signed. Keesey was being paid $12,750 by plaintiff. Bender had not authorized Glen to hire Keesey, and he opposed Keesey's employment because he felt that the loss of three out of four managing editors would injure plaintiff and would place a financial strain on the new enterprise. Nevertheless, Bender signed the contract with Keesey, which Glen had sent to him, but Keesey later changed his mind and decided to remain with plaintiff. Bender agreed to release him.

Glen also contacted William Marquis, the head indexer of plaintiff and an assistant managing editor. He offered Marquis employment with the new organization at a salary of $12,000, which was more than Marquis was earning, and when Marquis declined, he offered him $13,000. Marquis ultimately decided not to accept the offer. Bender had not authorized the employment of Marquis.

On December 15, Glen, Kalisch, Solie, Lahti, Baker, and 12 editors resigned from plaintiff's employ. Glen, Lahti, Kalisch, and Baker also resigned as officers or directors. At noon the departing editors met at a restaurant for lunch and executed tax information forms previously sent out by Bender for them.

Each of the persons (with the exception of Glen) who resigned from plaintiff's employ was contacted personally before he commenced working for Bender Co. by representatives of plaintiff, who invited him to return to plaintiff's employ. Plaintiff had every opportunity it desired to rehire these employees and utilized this opportunity without interference

---

[8]Glen's testimony with respect to his contact with Keesey is that he went to see Keesey not to hire him as an editor but because he felt bad at leaving plaintiff's employ without telling Keesey about it, that when he told Keesey he was going to leave, Keesey said, "Jud, I have been working with you for 12 years, and it seems I would hardly know what to do not working for you," and that Glen replied, "Well, Joe, would you really like to come with me?"

from any defendant. Plaintiff presented each resigning employee with the most favorable terms it was willing to offer in order to induce him to return to its employ, but it did not offer higher salaries than Bender Co. as an inducement. As a result of the meetings, Solie and two of the editors decided to remain with plaintiff. Subsequently, a number of other employees of plaintiff accepted positions with Bender Co.

The only findings of the trial court relating directly to the events described above are (1) that Gosnell came to San Francisco to discuss with Glen a possible raid on plaintiff's personnel by Bender Co. and to suggest salary increases to help insure against a raid on such personnel, and that Gosnell arrived in San Francisco on October 23, 1961, and met with Glen on successive days; (2) that Bender offered employment contracts to Kalisch and Lahti on December 2, that each of them accepted, and that Kalisch had become dissatisfied with his employment before he entered into the contract; and (3) that from December 10 through 12 a representative of Bender Co. contacted approximately 13 ordinary editors of plaintiff and offered each of them a job at a salary based on the wage scale for editors of comparable experience at Bender Co. and 10 of them accepted.

It was also found that the employees resigned on December 15, that plaintiff subsequently attempted to reemploy them in the manner set forth above, that none of the employees who resigned had a written contract of employment with plaintiff, that none was required to give notice before negotiating for or accepting other employment, and that the proper performance of their duties was not impaired because of their negotiation for or acceptance of employment with Bender Co.

The evidence recited above is conflicting in only one significant respect. Gosnell testified that he specifically asked Glen about a possible raid by Bender Co. on plaintiff's editorial staff, whereas Glen testified that Gosnell made no specific mention of Bender Co. in the conversation. In accordance with the rule that all conflicts in the evidence must be resolved in favor of the trial court's judgment, we shall accept Glen's testimony in this regard.[9]

[9]Another purported conflict relates to the extent of Glen's contact with Kalisch prior to the Carmel meeting. Plaintiff claims that the evidence shows that Glen solicited Kalisch for employment with Bender Co. prior to this meeting, while defendants argue that the evidence shows that the only contact Glen had with Kalisch regarding his employment with Bender Co. was that Glen told Kalisch "nothing more than" that a job was available with Bender Co., the amount of the salary, and the fact

In analyzing the legal principles applicable in this case, it should be repeated that we are not concerned with the simple right of one competitor to offer the employees of another a job at more favorable terms than they presently enjoy or the right of an employee (or an officer of a corporation) to seek a better job. The question here is whether the president of a corporation is liable for the breach of his fiduciary duty because of the conduct described above relating to other employees of the corporation and whether, under these facts, those who hire the employees are guilty of unfair competition for acting in concert with the president.

The general rules applicable to the duties of a corporate officer have been frequently stated. In the leading case of *Guth* v. *Loft, Inc.*, 23 Del.Ch. 255 [5 A.2d 503, 510], these obligations were cogently described as follows: "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing throughout the years, derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers." Section 820 of the Corporations Code provides that an officer must exercise his powers in good faith, with a view to the interests of the corporation.

There are only a few cases cited by the parties which involve the specific question whether an officer may offer employees of his corporation jobs with a competing enterprise he is preparing to join. These cases are not consistent in their results and appear to rest on general principles relating to the obligations of the fiduciary. (E.g., compare *Spring Steels, Inc.* v. *Molloy* (1960) 400 Pa. 354 [162 A.2d 370, 375], with *Duane Jones Co.*

that Kalisch could take it or not. Although it is true that Kalisch testified, in reply to a question by defendants' counsel, that Glen had told him "nothing more than" this before the Carmel meeting, this statement obviously cannot be accepted literally in view of the detailed testimony of both Kalisch and Glen relating to their negotiations for Kalisch's employment by the new organization prior to the Carmel meeting.

v. *Burke* (1954) 306 N.Y. 172 [117 N.E.2d 237, 245].)
■ The mere fact that the officer makes preparations to compete before he resigns his office is not sufficient to constitute a breach of duty. It is the nature of his preparations which is significant.[10] No ironclad rules as to the type of conduct which is permissible can be stated, since the spectrum of activities in this regard is as broad as the ingenuity of man itself.

The parties hereto have emphasized the issue whether an officer must disclose to the corporation his acts preparatory to entering into competition with it. This question is not identical with the issue whether the officer must reveal that he is negotiating for his own employment with a prospective employer, although, obviously, the two problems overlap since it is impossible for the officer to disclose his activities relating to the formation of a competing enterprise without also disclosing his own plans to join the competitor.

There is broad language in some cases to the effect that protection of the corporation's interest requires full disclosure of acts undertaken in preparation for entering into competition. (*Standard Brands Inc.* v. *U. S. Partition & Packaging Corp.* (1961) 199 F.Supp. 161, 173; *Sequoia Vacuum Systems* v. *Stransky* (1964) 229 Cal.App.2d 281, 287 [40 Cal.Rptr. 203]; *Daniel Orifice Fitting Co.* v. *Whalen* (1962) 198 Cal. App.2d 791, 801 [18 Cal.Rptr. 659].) An analysis of these

---

[10]Comment e of section 393 of the Restatement Second of Agency provides that an agent can make arrangements to compete with his principal even before the termination of the agency, but that he cannot properly use confidential information peculiar to his employer's business and acquired therein. "Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business. The limits of proper conduct with reference to securing the services of fellow employees are not well marked. An employee is subject to liability if, before or after leaving the employment, he causes fellow employees to break their contracts with the employer. On the other hand, it is normally permissible for employees of a firm, or for some of its partners, to agree among themselves while still employed, that they will engage in competition with the firm at the end of the period specified in their employment contracts. However, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements."

The illustration given by the Restatement is as follows: "A is employed by P as manager for a year. Before the end of the year, A decides to go into business for himself; in anticipation of this and without P's knowledge, he contracts with the best of P's employees to work for him at the end of the year. At the end of the year, A engages in a competing business and employs the persons with whom he has previously contracted. A has committed a breach of his duty of loyalty to P."

cases indicates, however, that the liability for breach of fiduciary duty was not predicated on the officer's mere failure to disclose such acts, but upon some *particular circumstance* which rendered nondisclosure harmful to the corporation or upon the officer's wrongful conduct apart from the omission.[11]

■ There is no requirement that an officer disclose his preparations to compete with the corporation in every case, and failure to disclose such acts will render the officer liable for a breach of his fiduciary duties only where particular circumstances render nondisclosure harmful to the corporation. (*C-E-I-R, Inc.* v. *Computer Dynamics Corp.* (1962) 229 Md. 357 [183 A.2d 374, 380]; Rest.2d Agency, § 381; cf. *Perryton Wholesale, Inc.* v. *Pioneer Distributing Co. of Kan., Inc.* (1965) 353 F.2d 618.) ■ Conversely, the mere act of disclosing his activities cannot immunize the officer from liability where his conduct in other respects amounts to a breach of duty. The significant inquiry in each situation is whether the officer's acts or omissions constitute a breach under the general principles applicable to the performance of his trust.

■ In our view, the conduct of Glen in the present case, when assessed by the standards set forth above, amounts to a breach of his fiduciary duties to plaintiff as a matter of law. The undisputed evidence shows a consistent course of conduct by him designed to obtain for a competitor those of plaintiff's employees whom the competitor could afford to employ and

[11]*Standard Brands Inc.* v. *U.S. Partition & Packaging Corp.* (1961) 199 F.Supp. 161, 173, involved a situation in which the officers not only appropriated property of the corporation for a competing enterprise they had secretly formed but induced the corporation's personnel to join the new enterprise but usurped the goodwill of the corporation by lavishly entertaining, at its expense, prospective customers of the competitive enterprise. It was held that the officers had a duty to disclose their plans so that the corporation could ascertain the wisdom of expending considerable sums of money under the circumstances and take measures in other respects to defend itself against the activities of the officers.

In *Sequoia Vacuum Systems* v. *Stransky* (1964) 229 Cal.App.2d 281, 287 [40 Cal.Rptr. 203], the officer of a corporation which manufactured vacuum systems, in pursuit of his plan to form a competing enterprise, designed a vacuum system for a competitor, utilizing information developed by the corporation, and falsifying his initials on the design drawings in order to maintain the secrecy of his association. As a result of his activities and on the basis of his plans the corporation of which he was an officer lost two jobs which were awarded to the competitor.

In *Daniel Orifice Fitting Co.* v. *Whalen* (1962) 198 Cal.App.2d 791, 801 [18 Cal.Rptr. 659], the vice president and chief engineer of plaintiff corporation was held to have breached his fiduciary duties by failing to turn over the product of his designing work to plaintiff during the time he was employed by it and secreting the results of his efforts for his personal use in a corporation he subsequently formed.

would find useful. If Glen while still president of plaintiff had performed these acts on behalf of Bender Co. without also obligating himself to join the company, there could be no doubt that he would have violated his duties to plaintiff. Surely his position in this regard cannot be improved by the fact that he was also to be employed by Bender Co. and was to share in the profits of the new western division. In carrying out his design, Glen misled Gosnell into believing there was no danger that Bender Co. would attempt to hire plaintiff's personnel, suggested a two-step salary increase without informing Gosnell that he had solicited some editors and that he or Bender Co. would solicit others if they successfully consummated their negotiations, and disclosed confidential information regarding salaries to Bender in order to facilitate the solicitation. Ultimately, positions at higher salaries than plaintiff was paying were offered either by Glen or Bender Co. to the treasurer of plaintiff, three of its four managing editors, one or two of the four assistant managing editors, three of the four indexers, and approximately 10 other editors.[12] We need not decide whether any of these acts would constitute a breach of fiduciary duty, taken alone, since there can be little doubt that, in combination, they show a course of conduct which falls demonstrably short of "the most scrupulous observance" of an officer's duty to his corporation.

## Misleading Gosnell

The conclusion is inescapable that Glen deliberately misled Gosnell regarding the possibility of a raid by Bender Co. on plaintiff's editorial staff and that his suggestion to Gosnell that half of the proposed salary increases for the editors be postponed until after January 1, 1962, without informing Gosnell of his plan to offer them positions, directly or indirectly, with Bender Co. at higher salaries if his own negotiations with Bender were successful, amounts at the very least to a deliberate and inexcusable failure to inform Gosnell of a matter of vital interest to plaintiff. In arriving at this conclusion we are mindful of the rule that when either one of two inferences may fairly be deduced from the evidence, an appellate court must accept the inference which will be favorable to the judgment. (See *Mah See* v. *North American Acc. Ins. Co.*

---

[12]The record is not clear as to whether one or two assistant managing editors were solicited. Marquis, who was approached for employment by Glen, was both an assistant managing editor and the chief indexer of plaintiff. The fact that some of these persons decided to remain in plaintiff's employ is relevant only to the issue of damages.

(1923) 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123] [overruled on another point in *Zuckerman* v. *Underwriters at Lloyd's London* (1954) 42 Cal.2d 460, 474 [267 P.2d 777]].) However, where only one inference can properly be drawn, the question becomes one of law. (*Hicks* v. *Reis* (1943) 21 Cal.2d 654, 660-661 [134 P.2d 788].)

It will be recalled that prior to Glen's conversation with Gosnell on October 23, he had been negotiating with Bender for his own employment as the head of a new western division, had told Bender that about a dozen editors might "accompany" him to the new enterprise, had engaged in active negotiations with both Kalisch and Solie regarding the terms of their employment by the new organization, and had suggested that Bender contact Baker for possible employment.

Although we accept Glen's testimony that Gosnell did not, in his conversation with Glen, specifically mention a raid by Bender Co., the only reasonable inference from Glen's testimony is that he understood the conversation as relating to a raid by *any* competitor. *Any* competitor necessarily included Bender Co., Glen's statement to Gosnell that if there was a raid on plaintiff's editorial staff, he (Glen) would be the first to know about it and would "presumably" report the matter immediately, must have been understood by Glen as a reassurance to Gosnell that so long as Glen was president of plaintiff, he would report a raid on plaintiff's editorial staff from any source, including Bender Co. That this was Glen's understanding of the import of the conversation is demonstrated by the fact that Bender himself consistently maintained throughout the trial and in pretrial depositions that, as Glen had reported the conversation to him, Gosnell had asked Glen if *Bender Co.* could be engaged in a raiding campaign, and that Glen had told Gosnell that this was not the case.

▮▮▮▮ As stated above, one purpose of Gosnell's visit to San Francisco was to forestall the possibility of a successful raid on the editorial staff by raising the salaries of the editors, but when this matter was presented to Glen he urged that these raises be made in two stages, one immediately, and one after January 1, 1962. In view of the extent to which Glen's activities relating to the formation of the new enterprise had advanced before the time of this conversation, his failure to reveal his negotiations with Kalisch and Solie and his plan to offer employment to the editors on behalf of a competing enterprise before the second half of the raise would be announced, if his negotiations with Bender were successful, amounts at

the very least to a flagrant failure to make a disclosure in a situation in which Glen knew that his omission would be harmful to plaintiff.

Defendants argue that Glen's motive in suggesting the staggered salary arrangement was to benefit plaintiff. They state: "Glen pointed out to Gosnell that some directors at Bancroft-Whitney felt that the move to the new building in the warehouse district [plaintiff planned to move its offices] in early 1962 was going to cause dissension among some editors. In this regard, Glen proposed that the raises be given in two steps" and that "the second step of the raise be announced at the time of the move to the warehouse district so as to placate the editors." Defendants cite no portion of Glen's testimony for this proposition and, so far as appears, Glen did not in testimony offer any explanation for suggesting the two-step arrangement. The parts of the record cited by defendants for this argument are quoted in the footnote.[13] In any event, even if we were to infer, in support of the judgment, that Glen was at least partially motivated in his suggestion by a desire to benefit plaintiff, this cannot excuse his complete failure to divulge important information to Gosnell where fidelity to his duties obviously required it.

*Disclosing the Salaries of Plaintiff's Employees*

Another significant aspect of Glen's activities on behalf of Bender relates to the list of employees and their salaries compiled at Carmel. It is beyond question that a corporate officer breaches his fiduciary duties when, with the purpose of facilitating the recruiting of the corporation's employees by a

---

[13]In support of their claim that Glen pointed out to Gosnell that he was proposing the two-step raise to placate the editors at the time of the move to the warehouse district, defendants cite the testimony of Roderick Rose, an officer of plaintiff, who testified to the effect that some of the directors of plaintiff were apprehensive about whether the employees would be happy with the move and that Rose himself thought that the effect of the raise upon the employees' morale would have been lost if it had been announced in December, five months prior to the actual move:

"Q. Do you recall that sometime during 1961 it had been finally decided to move into this new building down in the warehouse district in the year 1962?

"A. [Mr. Rose] I believe it was—yes, I believe it was sometime in 1961, yes.

"Q. And do you recall that Mr. Glen stated that he wanted to hold back the second half of this raise that he and Mr. Gosnell had talked about until that time in 1962 when Bancroft-Whitney did move down to this new building?

"A. I knew nothing of this until after the events of December 15th, 1961. They were not within my knowledge prior to that time.

"Q. They are now?

competitor, he supplies the competitor with a selective list of the corporation's employees who are, in his judgment, possessed of both ability and the personal characteristics desirable in an employee, together with the salary the corporation is paying the employee and a suggestion as to the salary the competitor should offer in order to be successful in recruitment. This conclusion is inescapable even if the information regarding salaries is not deemed to be confidential. No case has been cited or found considering the question whether a list of salaries paid by a corporation to its employees is confidential. We are of the view, however, that such an unpublished list does constitute confidential information and that an officer of a corporation violates his trust if he reveals it to a competitor for the purpose of enabling the solicitation of the corporation's employees by the competitor.

The Restatement of Agency provides that the rule prohibiting the disclosure of confidential information by an agent applies ''not only to those communications which are stated to be confidential, but also to information which the agent should know his principal would not care to have revealed to others or used in competition with him. It applies to unique business methods of the employer, trade secrets, *lists of names*, and all other matters which are peculiarly known in the employer's business. It does not apply to matters of common knowledge in the community nor to special skill which the employee has acquired because of his employment.'' (Rest.2d Agency, § 395, com. b.) (Italics added.) The salaries paid by a corporation to its employees are not matters of common knowledge and, even among corporation employees, they are divulged only to those persons or organizations directly concerned with personnel matters or to responsible fiduciaries.

---

''A. That is insofar as the editorial salary increases are concerned? I knew we expected to move into the building sometime in 1962.

''Q. And there was apprehension on the part of the Bancroft-Whitney directors that there might be some mild dissension by virtue of this change?

''A. I think some of the directors felt that way; others did not. I think it was—I think there were mixed feelings among the directors.

''Q. Editorial employees would have been among those who would not have desired to make the change from Hyde and McAllister to the warehouse district, would they not?

''A. Yes, but that would not have solved our over-all problem, if we had one, of keeping employees with Bancroft-Whitney Company.

''Q. Now, based upon your knowledge of employees here at Bancroft-Whitney and employee relationship in general here, would it not be a fair statement to say that the effect of this raise upon the employees' morale would have been lost if it had been announced in December, some five months prior to the actual move? A. Yes.''

Defendants argue that the salary information is not confidential because the employees could have revealed their own salaries to Bender Co. or anyone else. It requires little talent to distinguish between a situation in which an individual voluntarily discloses his own salary to another and one in which the unpublished salary list of a group of prospective employees is revealed to a competitor for the purpose of facilitating the recruitment of the corporation's personnel.

### Assisting the Solicitation of Plaintiff's Employees

The assistance given by Glen to the solicitation of the editors on the list is also to be condemned as a breach of his fiduciary duty. As we have seen, Glen not only provided the list on which the recruiting was based, but he suggested certain tactics to be followed in discussions with the editors, supplied a picture of the new organization's quarters for use by Billo, discussed the persons on the list with Billo during the recruiting campaign, and, in Glen's own words in his letter to Bender, Billo was to keep in touch with him so that "he and we here can cooperate to full advantage." In addition, Glen personally approached Lahti, Kalisch, Solie, Keesey, and Marquis and offered them employment.

Defendants argue that the salary list provided to Billo was not used by him in offering salaries to the editors he was soliciting. It is true that Billo said in his deposition that he offered the editors on the list a salary "comparable" to what editors were earning at Bender Co. and that he had complete discretion as to the salary to be offered. However, he also stated that in most cases the salary he tendered was higher than that suggested on the list, and one of the editors solicited by Billo who testified at the trial stated that Billo had offered him a salary $900 "more than" he was earning with plaintiff, and the other editor testified that Billo had told him he would receive an "increase in salary of $1100."

Another matter relied upon by defendants relates to a letter written by Bender on October 10, 1961, to a man named Briggs, who was a director of LCP but was seeking employment with Bender Co. In this letter, Bender stated that he was interested in employing Glen and Baker and that although he had no intention of conducting a raid on plaintiff's personnel, he would not turn his back on any opportunities offered. Briggs showed this letter to Gosnell, and defendants argue that Bender knew Briggs would do so and that therefore Gosnell had been fully informed by Bender of his plans.

However, *after* seeing this letter Gosnell came to San Fran-

cisco and received assurances from Glen that he would report to Gosnell any attempt to raid plaintiff's editorial staff, and Glen told Bender he had assured Gosnell that Bender Co. did not intend such action. Thus, any effect of the notice was dissipated by Glen's deception of Gosnell, a matter of which Bender had knowledge. Moreover, the basis underlying the action against Bender and Bender Co. is their cooperation in Glen's breach of fiduciary duty. Since Glen committed many disloyal acts with Bender's knowledge and cooperation, notice of Bender's interest in plaintiff's employees would have been of little significance, and the letter to Briggs does not materially affect the liability of Bender and Bender Co.

Defendants claim that from and after 1960, when Gosnell became president of LCP, Glen's authority was so circumscribed that he was merely a figurehead of plaintiff, and that this matter should be considered in assessing the extent of the fiduciary duty which Glen owed to plaintiff. This contention evaporates upon analysis, however, for Glen was considered to have sufficient authority as president of the corporation to warrant Gosnell, promptly upon learning of a possible raid by Bender Co., to make arrangements to come to San Francisco to discuss the matter with him, and Glen was considered by Gosnell to be so conspicuously a fiduciary of plaintiff that he accepted Glen's assurances regarding a raid upon the editorial staff and, in reliance upon these assurances, agreed to Glen's idea of a two-step raise for the editors.

It is clear from the evidence set forth above that Bender was aware of or ratified Glen's breach of his fiduciary duties in all but a few respects, that he cooperated with Glen in the breach, and that he received the benefits of Glen's infidelity. It cannot be said here, as was stated in another context by Justice Pitney in *International News Service* v. *Associated Press* (1918) 248 U.S. 215, 239 [39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293], that Bender Co. did not "reap where it had not sown." Under all the circumstances, Bender and Bender Co. must be held liable for their part in Glen's breach of his fiduciary duties. (*Southern Cal. Disinfecting Co.* v. *Lomkin* (1960) 183 Cal.App.2d 431, 444-448 [7 Cal.Rptr. 43]; *Raines* v. *Toney* (1958) 228 Ark. 1170 [313 S.W.2d 802, 810, 811]; *Frank H. Gibson, Inc.* v. *Omaha Coffee Co.* (1965) 179 Neb. 169 [137 N.W.2d 701, 708]; Rest.2d Agency, § 312.) They encouraged the sowing and reaped the benefit. They cannot now disclaim the burden.

None of the authorities relied upon by defendants is inconsistent with the conclusion we reach herein. We find factually distinguishable the cases of *Sarkes Tarzian, Inc.* v. *Audio Devices, Inc.* (1958) 166 F.Supp. 250; *Spring Steels, Inc.* v. *Molloy* (Pa. 1960) *supra*, 162 A.2d 370; *H. & S. Manufacturing Co.* v. *Benjamin F. Rich Co.* (1962) 40 Del.Ch. 304 [181 A.2d 431]; and *Jones* v. *Ernst & Ernst* (1931) 172 La. 406 [134 So. 375]. The other cases cited by defendants are irrelevant. They either involve situations in which an officer or employee resigned from the corporation *before* offering employment to the corporation's personnel (*National Welding Equipment Co.* v. *Hammon Precision Equipment Co.* (1958) 165 F.Supp. 788;[14] *Eastern Air Devices, Inc.* v. *Gaites* (1953) 281 App.Div. 761 [118 N.Y.S.2d 258]; *Richard M. Krause, Inc.* v. *Gardner* (1950) 99 N.Y.S.2d 592), or in which the only issue was whether one corporation or individual could properly offer another corporation's employees better terms of employment (*Triangle Film Corp.* v. *Artcraft Pictures Corp.* (1918) 250 F. 981; *Du-Art Film Laboratories, Inc.* v. *Consolidated F. Industries* (1936) 15 F.Supp. 689).

### Trade Secrets

The trial court found that no employee of plaintiff who joined Bender Co. had disclosed or used any trade secret or confidential information of plaintiff. Plaintiff claims that Glen, as chairman of the product planning committee of LCP, knew of its program for 16 tentatively titled future publications of plaintiff, and it asserts that this knowledge, together with information as to publication dates, constitutes a trade secret. Since there is no evidence that Glen revealed any of this information to Bender Co., plaintiff relies, in this regard, solely on the fact that after Glen's departure, Bender Co. published works on the same subjects as those contemplated by plaintiff.

A few months after Glen became associated with Bender Co. it published the first volume of a series on "California Forms of Pleading and Practice," a book which emphasized forms rather than text, and plaintiff, prior to Glen's departure, had planned a publication on California practice and procedure

---

[14]In this case a corporate officer and director was discharged by the corporation and opened a new business several months later. A close personal friend of the officer, who was also a director and employee of the corporation, later resigned to join the new business. Technically, both men remained directors of the corporation for several months after the new enterprise was formed, since the corporation did not elect other men to replace them until some months later.

which was to emphasize textual material. Although it is claimed that the work planned by plaintiff and the one published by Bender Co. are similar, they appear to differ in basic format, and plaintiff cites nothing from the record to indicate any similarity between the two, aside from the fact that both publications cover the same basic subject matter. In May 1962 Bender Co. published a book entitled ''The Low Back'' and plaintiff had been working on a book entitled ''Back Injuries'' which was to have been shipped before Glen left plaintiff's employ, but which had not been completed. The evidence shows that Bender Co. had commenced this work long before Bender's contact with Glen, and that the new western division did no work on it. There is also evidence that plaintiff had gathered certain materials on interrogatories for inclusion in one of its books and that the western division published a book entitled ''Forms of Interrogatories'' in early 1963. No connection between the two circumstances is alleged by plaintiff.

### Damages

 Defendants argue that even if we conclude that Glen breached his fiduciary duty and that the other defendants are guilty of unfair competition, we cannot award any damages for this wrongdoing because plaintiff has failed to show that the departure of the employees was proximately caused by defendants' actions. They admit that the primary reason the employees left was that they were offered higher salaries by Bender Co. As recounted above, it was Glen's breach that enabled Bender to determine the amount of salary which would induce these persons to leave plaintiff's employ. Under these circumstances there is no merit in defendants' contention. The causal relationship between Glen's violation of duty and Bender's persuasive inducement to the plaintiff's personnel is crystal clear.

 Defendants urge that plaintiff itself bears responsibility for the ultimate departure of its employees because it failed to offer higher salaries in order to induce them to return after they had reached agreement with Bender Co. We cannot indulge in an assumption that such offers would have been accepted under the circumstances. In any event, the question of plaintiff's conduct subsequent to the successful recruitment campaign of defendants relates to the question of damages rather than to proximate cause. To hold otherwise would sug-

356

gest that a corporation could not protect itself against an officer's breach of fiduciary duties in this regard, no matter how flagrant his conduct, since it could always be said that the corporation which lost its employees might have offered them additional salary to return and that the departing employees might have accepted these offers.

Plaintiff sought damages for the loss of Kalisch, ten of the editors who left its employ on December 15, and one editor named Parnell who left after the others. Defendants correctly contend that Parnell resigned after plaintiff refused to give him a promotion rather than by reason of any conduct by Glen, and that, therefore, no damages may be awarded because of his resignation.

The trial court found that plaintiff was not damaged in any amount by any tortious acts of defendants, that by the end of 1962 it had fully recovered from the adverse effects "if any" caused by the loss of personnel, and that the only adverse effect "if any" on plaintiff from this loss was a contribution to a delay in 1962 in the preparation and shipment of its work. The undisputed evidence shows that plaintiff suffered other adverse effects as well, and the trial court's findings in this regard are not supported by the evidence. At the very least, it was shown without contradiction that plaintiff had incurred certain expenses in attempting to persuade the persons who had resigned to return to its employ.

Plaintiff asks this court to exercise its powers under section 956a of the Code of Civil Procedure and to make findings on the question of damages.[15] The evidence relating to damages suffered by plaintiff as a result of the resignation of the editors was extensive and complicated, and raised a number of factual issues. Several experts testified, using various approaches to estimate the damages, and these experts were vigorously cross-examined by counsel for defendants. Under the circumstances, it is inappropriate for this court to exercise its fact-finding powers.

The trial court's conclusion that Bender and Bender Co. were not activated by malice in their actions finds support in

[15]Section 956a of the Code of Civil Procedure provides in part, "In all cases where trial by jury is not a matter of right or where trial by jury has been waived, the Supreme Court or a district court of appeal may make findings of fact contrary to, or in addition to, those made by the trial court. Such findings may be based on the evidence adduced before the trial court. . . . This section shall be liberally construed to the end, among others, that wherever possible causes may be finally disposed of by a single appeal and without further proceedings in the trial court, except where the interest of justice requires a new trial."

the record. ▮▮▮ The cause of action for punitive damages does not survive Glen's death (Prob. Code, § 573).

The judgment is reversed with directions to the trial court to retry the issue of general damages and enter judgment for plaintiff.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.